Our fourth case for this morning is United States v. Pedro Pereira, or actually, Pereira v. United States, excuse me, 14-1301, Miss Englund. May it please the Court, my name is Rachel Englund, and I represent Pedro Pereira. Your Honors, there is insufficient evidence in this case to prove beyond reasonable doubt that Pereira conspired to distribute marijuana. There is no direct evidence, and the United States failed to put on sufficient circumstantial evidence. And I would like to make two points. First, this Court should not permit the United States to rely on a street term to prove a legal term of art. There is no evidence in this case of returnable drugs, and therefore, the United States cannot rely on a consignment theory to prove conspiracy to distribute. And second, the government failed to prove beyond a reasonable doubt that the credit sales at issue were part of a conspiracy to distribute rather than mere buyer-seller relationships. So, even if I were to agree with you about the alleged upstream conspiracy from Clark through Helsing to Pereira, what concerns me is about the downstream conspiracy where Pereira sells marijuana to Ercioli and Pisani. There are text messages that make it sound like they're all on the same team. They trust each other. There seems to me a fair amount of activity that a jury could consider takes the downstream beyond buyer-seller. So, maybe you could talk about that a bit. Of course, Your Honor. First of all, Ercioli testified that he had his own customers, and Pereira had his own customers. Pisani testified that he was my client's customer. And throughout all the testimony, neither of those individuals testified that Pereira ever told them to sell drugs, to whom to sell drugs, how to price their drugs, or what quantity to sell. So, they're just… What about Pereira paying Ercioli to store the marijuana in his house, telling him maybe you should get your father to move out because he's going to blow the whistle or whatever the thought was? I'm not saying it's the greatest amount of evidence I've ever seen, but it seems like there is evidence beyond just saying, hey, buy this much marijuana from me. Well, Your Honor, we disagree that that's sufficient evidence. First of all, Pereira was not charged with maintaining a drug-involved premises, nor was he charged with conspiring to do so. But the point is, really, is the relationship between these two people simply that of a seller and a buyer, even a regular seller and a buyer, as we've said in some of our cases in this area, kind of Macy's or whatever, or is it a more comprehensive relationship that a jury could see as conspiracy? Well, Your Honor, this court has held that you have to look at the totality of the circumstances, and I think it's important to look… Yes, we've held that. It is a generalized test. I would agree with that. But there are a number of factors in Johnson that just aren't present here. For example, there's no evidence of an agreement between them to look for any sort of other customers. There's no evidence, for example, for a payment of commission on sales. There is no evidence, for example, that Pereira received advice on how to run his business. And there's also, with respect to the upstream conspiracy, I think the lack of mutual trust is really key here. But Pereira does dispense some advice on how to run businesses, and there's that text to Pisani, I think, giving somebody the $4,000, the kid can handle it, I trust the kid, you trust me, you know, all that. Well, first of all, that text message doesn't actually mention anything about narcotics. But shouldn't a jury see that's what it's talking about? We don't draw inferences against the jury's verdict. Well, you know, that is true, but even under that interpretation, we would argue that it's insufficient to get over the hump. There may be some inference there, but it's insufficient to get over the equipoise between a buyer-seller relationship and a conspiracy. Now, Your Honors, we would argue that the crux of the government's case here has been, before this Court, has been their consignment theory. And, in fact, the government has mentioned consignment 47 times in its 33-page brief. But the most important use of the word consignment in their brief is in footnote 3 of their facts section, where the government defines the term consignment for the use in its brief the way this Court has defined a credit sale. You know, and in doing so, they've essentially conceded that the testimony in this case used consignment as a street term, as fronted drugs, which is a credit sale. So this Court should not allow the government to rely on a street term to prove a legal term of art. This Court has held that the legal meaning of a term is, of course, different from its colloquial use, and it was the burden on the government to prove returnable drugs. There's no such evidence here. The government has conceded that the record is silent on Pereira's ability to return drugs to Clark, and there is no evidence that Pereira allowed his customers to return drugs to him either. And, in point of fact, Passani testified that Pereira was not happy about returns. But he took them sometimes, didn't he, even though he disliked them? No, Your Honor, we would not agree with that. First, the testimony that came in was about an exchange of drugs. Well, he diverted, I guess, to the Michigan body. He rejects something, right? Oh, right, with respect to the supplier side. That's right. On one occasion, he did reject drugs, but he didn't accept them. That's not a return. In that instance, we would say it goes specifically to the lack of mutual trust between him and his supplier because, you know, the supplier came from California to meet with him five out of the six times that he received drugs from him. And the courier testified that he negotiated on the terms of those transactions each time, both with respect to the quality of the marijuana and with respect to the price. And so on the one time when the supplier did not come with the courier to deliver the drugs, he rejected them outright because he wasn't able to negotiate. It may be that Your Honor was referring to some evidence in the record that came from Pisani that he was able to exchange drugs. And we wanted to clarify that, in our view, an exchange of drugs is different from the ability to return drugs because it doesn't carry the same inference of conspiracy. Because a seller could say, all right, here, take these drugs, go sell them, either bring me back the cash or bring me back the unsold drugs. That's where the inference of conspiracy comes from. In contrast, if you have an exchange of drugs, that just suggests that could easily go with a buyer-seller relationship where you give someone drugs for their own personal consumption. And if they say, well, you know, this isn't wet, this is too wet or not fluffy enough, I believe that's the testimony, so they might just swap it out. That doesn't distinguish it from a buyer-seller relationship. And secondly on that point, I think all of the evidence about returnable drugs on the resale side, it's a little unclear in the record, but it appears to me that it wasn't even with Pedro Pereira, but rather with regard to his brother. I think that Pisani was testifying that he exchanged some drugs with Jimmy Pereira, who has been acquitted, so that's not relevant here. I'll reserve my time. Thank you, Your Honor. All right. Thank you. Mr. Walters. Good morning, Your Honors. May it please the court, counsel, Greg Walters on behalf of the United States. Your Honor, there are two fact patterns that this court has said are widely accepted as sufficient to prove a conspiracy, the one being a consignment arrangement and the second being where there are repeated transactions involving wholesale quantities of narcotics or drugs on credit. But I have a bone to pick with the government in the brief with respect first to the consignment point, because the government conflates credit sales and consignment sales in a way that isn't very helpful, and I think one way or the other, we deal with function, with reality, not labels, and somebody could call it a consignment if I go to Macy's and buy myself a China plate. It's not a consignment, even though I can return the plate if I don't like it, if I discover scratches on it or something like that. It's just a credit sale, assuming for the sake of argument that I have a Macy's credit card. And similarly here, you can call these consignments or credit or whatever, but you have to look at the underlying substance because consignments do add to the relationship and credit sales don't. The large quantities, I think you can find isolated language, but the truth is major grocery store chains buy very large quantities of flour that they distribute among their stores. Nobody thinks because it's a repeated large quantity transaction, it's automatically illegal. So I think we need, you know, we've been trying in cases like Brown, in cases like LeChuga, to drill down to what is it that is the extra beyond the buyer-seller. And so I said to Ms. Anglin, I've got some real problems with your upstream conspiracy theory. Your downstream conspiracy theory, maybe you've crossed the line. Maybe you've shown that there's more than just buyer-seller. But boy, I have trouble with the upstream. If I could first address Your Honor's question about conflating the terms. We certainly weren't trying to mislead the court at all. I think the difficulty in stating facts in a case like that where you have witnesses, who at least in my experience in trying drug cases, I've rarely had a witness even use the term consignment. The government could coach people, just say consignment. I agree. Maybe you didn't. But we certainly didn't coach defense counsel to use consignment in cross-examination or in his closing argument. Sometimes people don't react appropriately to coaching. They forget. Or they use their own term anyway. I would like to suggest to the court, I didn't try the case, but I mean there's no evidence of coaching. And you haven't from, but anyway, the point I want to make with the court. If they're calling it consignment and there's no right to return, then they aren't describing something that the law recognizes as consignment. The problem is with what the court or counsel has labeled as upstream and downstream, which I would note, they've never argued variance. They got the multiple conspiracy instruction at trial, and she hasn't argued material variance in her brief. I mean, I see this as a conspiracy involving California to New Jersey. It's a distribution network, fronting from California to New Jersey and then to the sub-dealers. So what I'd like to point out first, though, if you do want to look at it in the context of just an upstream conspiracy, I would suggest to the court that Brown makes it clear that there's still sufficient evidence. And let me explain why. We have repeated fronted transactions of wholesale quantities, and this court in Brown stated that that is widely accepted as sufficient proof of a trafficking conspiracy. When either is satisfied, whether it's consignment or, as the court said, the three Johnson factors, multiple wholesale transactions on credit, a reasonable jury can make the inference of conspiracy. That's a broad statement. I'm not sure that just in the abstract. Again, that suggests that most middlemen in the United States are doing things that would be illegal. Your Honor, I think if we could go back to Brown, the court was synthesizing its case law on point of conspiracy. And this court in Brown said when one of the factors that is somewhat inherent in a conspiracy is opposed to a buyer-seller relationship, and they gave a list of non-existent. And we said credit sales do not necessarily permit an inference of conspiracy. That's in Brown. And the court continued saying, for example, a credit sale could be for personal use. But when there's multiple transactions on credit and wholesale quantities, this court clearly stated that that is sufficient for a jury to conclude that there is conspiracy. So what you have is one factor that is distinct from a buyer-seller relationship. I agree with the court. That's being credit. But then the court in Brown said that once at least one of those factors is shown, you can use other evidence that may exist in either a buyer-seller relationship or a conspiracy to bolster the conspiracy argument. Your idea is if you have lots of buyer-seller transactions, it becomes more than buyer-seller. No, not at all. I would not say that. That's spot transactions. No, more than spot transactions. General Motors has suppliers that it's been dealing with for 50 years. It has lots of buyer-seller transactions with them. They're separate companies. I guess I need to make sure I'm using the correct term. When I hear you say buyer-seller, I think spot transaction. When I think credit transactions, I think based on this court's case law, it takes it out of the context of buyer. So lots of buyer-seller transactions where there's 30-day credit terms equals more than buyer-seller in your view. When it's in a wholesale quantity and it's repeated. I think Brown says that, Your Honor, not me. This court has said that. And it's because those are on terms that are beneficial to the buyer. There's mutual interest there. If I, as a dealer, am providing something in wholesale quantity to a sub-dealer on credit, I don't get paid until he or she has gotten paid and is able to get their money back to me. Well, if it's a regular credit sale, you have to be paid whether or not they've sold it. If I buy something on credit at a store, they don't really care what I've done with it. I have now incurred a debt that I have to pay. That's credit as opposed to consignment. And I'm getting away from the term consignment because I can understand the court's concern since that wasn't defined. But I think what we can say is that these were definitely credit sales and there's no money coming back to Mr. Clark in California unless Mr. Pereira is making money. That's just a practical matter. If it's a real credit sale, what I'm saying is that doesn't matter. He still has to pay his debt back no matter whether he sold it or not. Maybe he has to sell one of his houses. But his ability to pay it back is certainly dependent upon his ability to sell that marijuana. And so Mr. Clark is not going to continue dealing with him, nor is Mr. Pereira going to be able to continue to deal with him unless that mutual trust has continued to be extended of, here you have it on credit, and then over time this relationship builds a payment back. And, again, Your Honor, I'm using the court's language from Brown about... Brown says a lot of things, actually. Well, may I then direct the court's attention to if the court would like to divide it into an upstream, downstream, or use that terminology, it can't get much clearer than Mr. Clark... Well, I agree with you that it's enough. I mean, if you can show a conspiracy among Pereira and Pisani and Urchioli, you've satisfied what you had to do under the indictment.  I just don't want to let go of the initial part since I think it is consistent with Brown and this court's language. And I understand that it's said a lot, but I think this court took a lot of different cases, and what we see is not an evolution of the law. I don't mean it in that way. It's sent, at times, cases that have been difficult to understand, and I think it tried to synthesize and did it as clearly as possible, given the amount of precedent on this buyer-seller issue. And so I do come back to at least what this court said. We'll take away consignment. We use that term because it was used at trial and counsel as well used at trial. But even if we look at just a pure fronting relationship, multiple fronts and wholesale quantities, I think under Brown meet that, meet the sufficiency of the evidence requirement. Multiple wholesale transactions on credit, this court has said, is widely accepted as sufficient proof of a trafficking conspiracy. And since Brown, I believe it's repeated that statement in United States v. Jones, a 2014 case, and I think there was one other one that I don't have off the tip of my tongue. I see that my time is almost up. I would like to answer any other questions the court might have. Thank you for your time, Your Honor. Thank you. Ms. Anglin. Your Honor, I would like to make two points in rebuttal. First, counsel's use of the term consignment in his discussions with witnesses in the trial below and in his closing argument does not work as a concession. Now, the government bore the burden of proof, to prove returnable drugs, and they failed to do so. And as far as I can tell, counsel's use of a street term being a concession has not been a widely tried point, but we've cited to a 1995 case from the Ninth Circuit where counsel used the word murder, and the court found that that was not a concession, that his client used committed murder as opposed to manslaughter, but rather just the street use of the term. And second, I would like to point out that in Brown, this court refused to give, quote, talismanic power to the items and factors that this government has relied upon and asserted are a per se rule. This court has refused to fixate on particular powers at the expense of other informative evidence, and that other informative evidence is key here, particularly the lack of mutual trust. And we would ask that this court reverse the district court's denial of Mr. Prera's post-conviction motion for acquittal and that Mr. Prera be acquitted. Thank you, Your Honors. All right, thank you. You were appointed, were you not? Yes, Your Honor. We appreciate your help for the court and for your client, and thanks, of course, as well to the government.